Case No. 13-5028 et al., United States of America, United States Department of Justice et al. v. Philip Morris USA Inc., formerly known as Philip Morris Incorporated et al. Appellants, American Tobacco Company, directly and as successor to the Tobacco Interest of American Brands Inc. et al., Appellees Ultra Group Inc., formerly Philip Morris Companies Inc. Appellant, SmithKline Beecham Corp., doing business as Waxo SmithKline et al. Mr. Estrada for the Appellants, Ms. Patterson for Appellees United States of America et al., and Mr. Crystal for Appellees Tobacco-Free Kids Action Fund et al. Thank you, Judge Nadel, and may it please the Court, Miguel Estrada for the Appellants. In keeping with the 2009 judgment of this Court, the defendants stand ready to disseminate truthful, factual information about the health effects of their products. The main question in this appeal is whether they can also be compelled to tell the world that they deliberately deceive the American public or intentionally engage in other wrongdoing. Therefore, we submit that the mandate of this Court in the 2009 opinion, RICO and the First Amendment, require that the answer be no. Let me start by emphasizing that the compelled statements that this Court authorized in 2009 must meet two distinct requirements, must meet both of them. First, they must restrain future RICO violations rather than eradicate the effects of past violations. And second, as this Court pointed out, they must be purely factual and uncontroversial, and not unduly burdensome or disorder. The confessional preambles and the other admissions of wrongdoing in this case meet neither of those requirements. Let me start with the RICO part. Before you get there, it seems to me there are two rationales for imposing this kind of a requirement on a RICO defendant. One is to dispel a misimpression that the public has about the particular product as a result of the advertisements that went before. And the second is to deter future violations. I don't see anything about dispelling a public misperception about the safety of cigarettes. So it's just deterrence. Well, it's actually not even that. I think both of those theories have been rejected, as broadly stated as that, in two opinions of this Court. The disgorgement case pointed out that you could not have just simply general deterrence, or the theory that anything that hurts a RICO violator must be permitted by Section 1864A. And the 2009 opinion expressly compared this statute with the FTC Act, where all of these cases have come up in the past, and where it is a permissible government aim under the FTC Act to try to dispel the effect of past deception. The FTC Act is what you're saying? Yes, the FTC Act, the Federal Trade Commission Act. As a total aside, I just read of an opinion of the Seventh Circuit upholding an order by the FTC requiring Egg Manufacturers Association to tell the consuming public that eating eggs increases your cholesterol? Yes. And the latest report is that's not true. Well, so maybe it's not purely factual and uncontroversial, Judge Randall. But the point that I'm trying to emphasize is that you have to analyze the First Amendment issue here by first ascertaining what the permissible government interest is. In the 2009 opinion, this Court acknowledged that the FTC Act... Wait, before you go to the... I thought you were going to... you were first talking about the RICO. Yes, and... Do you want to go on to the First Amendment? Would you like... could we stick with RICO for just a minute? No, sure. I was going immediately back to point out that in 2009, this Court contrasted RICO with the FTC Act and concluded that unlike the FTC Act, it is not a permissible government interest under Section 1964A to eradicate the effect of past wrongdoing. And it was expressly for that reason that this Court turned down the government cross-appeal, which looked to get essentially what the government is now trying to get in this preamble, which is to say a campaign of corrective advertising designed to educate the people about past wrongdoing. Right. I get your point about the preambles, that... I see your point about that, and I have some questions for the government about it. But could I ask you to focus on just specifically the three bulleted points? Cigarette companies intentionally designed cigarettes. One says intentionally designed cigarettes with enough nicotine to create and sustain addictions, did it to maintain addictions, and then the third one is... In other words, these three are not about the deception of the public, but they're about the company's actions with respect to their product. And, you know, we said in our 2009 opinion that a requirement that they, quote, withhold previously hidden proof about their products will prevent and restrict. And isn't that what these three do? No, but I think it's very important to read that statement that you just quoted, Judge Tatel, in the context of this Court's ruling with respect to the cross-appeal, because in the cross-appeal you said that merely to get rid of the effects of past wrongdoing was not sufficient, and that the only reason why the corrective statements that we are now talking about could be authorized under RICO is to keep the defendants, in effect, from speaking out of both sides of their mouth about the intrinsic qualities of their products. Now, the second bullet in B, which deals with the subject of addiction, and the first and second bullets of, I think, you know, the manipulation standards, which I think are the ones that you're talking about right now, really say nothing about the defendants' products as such. They say something about the defendants' conduct. No, I understand what you're saying, but I'm just wondering whether that particular battle is over in view of the very specific language in the 2009 opinion, quote, requiring defendants to reveal the previously hidden truth about their products will prevent and restrain. Right? That's exactly from our opinion, and that's the way that the Procurian panel described it. And you're right, we struck down other aspects of the remedy in other parts of the opinion in the cross-appeal, but this is law of the case language. See, but I think that it is not fair to the mandate of the court, because the mandate of the court pairs that statement with a very specific requirement that these things have to be factual and uncontroversial and about the products on their charter as well. That's your First Amendment argument. Well, I didn't say that, but if I want to go back to the RICO. I just wanted to focus on RICO. No, I understand. And then we'll talk about the First Amendment. Right, but I think, you know, you have to come up with a way to, one, you know, the government has to come up with a way to overcome the more general ruling in the discouragement opinion, which is also law of the case in this case. It's not a separate case. Right. That a theory of general deterrence is not one that can help deter and prevent future violations. And I could well read more consistent with both opinions, you know, the language that you quoted by requiring defendants to reveal intrinsic qualities of their products that were previously hidden from the American public for the sole purpose, as this court said, of keeping them from restating the falsehoods in the future. This is not, again, a retrospective remedy. It has to be paired with the only purpose that this court recognized, which was to keep us from speaking out of both sides of our mouth in the future. I mean, you could see a manufacturer of soda pop, for example, being told that it has to disclose that there is a color added or X added for taste, and that's an intrinsic quality of the product. But it doesn't necessarily imply a requirement that, you know, the manufacturer is intentionally trying to bamboozle you by having this look red. Okay, but I just want to get you to focus with me on the language. I understand your point about the broader language in the disgorgement opinion and elsewhere, but it wasn't just that we said reveal the previously hidden truth. The record before us in that case, the district court's 06 order had expressly said that the defendants had to make corrective statements about their manipulation, their manipulation of the physical and chemical content of cigarettes. Right? Yeah. And then that, I don't recall the defendants challenging that before the court. And in our opinion, we specifically said that we recognize that the defendants would have to be under the district court's order, would have to, they would be required to make a statement regarding, quote, their manipulation of cigarette design and composition. So my only point about all this is that it seems like these three, and I'm only talking about these three corrective statements, not the preamble. It sounds to me like if you read our previous opinion, both the language in the opinion and what was before us and what the defendants had raised, that this issue is essentially resolved, as long as these three statements, quote, reveal the previously hidden truth about the product. I understand that. That's my point. So what's your answer to that? I understand that argument to be a separate argument. And my answer to that, Judge Nadal, is that when you had the categories of statements in front of you, you expressly noted that the actual content of them was not actually in front of you. And I don't think that you can fairly say that merely because one of the categories relates to manipulation, that it necessarily implies that there has to be a statement about the defendants' conduct, even under RICO, rather than a statement of the intrinsic design qualities of the product. But if I'm not able to persuade you on that, I would like to. I didn't say you hadn't. Well. I was just asking you about that. I'm just trying to be, you know, I'm trying to satisfy your concern on making economic use of my time as well. Because at the end of the day, and with all due respect, given that the government has to meet a double-barrel standard, both RICO and the First Amendment, actually a three-barrel standard, RICO, again, the First Amendment, and the mandate, but we can disagree on the third one. Ultimately, this Court said that whatever meets RICO also must be factual and uncontroversial under Zotero. And we know from this Court's recent on-bank opinion in the American Meat Institute case, which was said multiple times in that case, that statements that pass muster under Zotero must relate to the intrinsic qualities of the product itself, obviously not to the conduct of the defendant. So that even if there were room in the mandate of the Court, both in the discouragement case and the 2009 opinion, for the proposition that RICO permits compelled statements about our past conduct, and I don't think there actually is, you would still, the government would still have to overcome this separate burden under Zotero's standard. Right, and the government says about that, the government says, yes, the standard is factual and uncontroversial, and they point out, or they argue, that each of these three corrective statements, again, I'm not talking about the preamble, I'm just talking about these three bulleted statements, that each of these rests on specific district court findings that the defendants didn't challenge in the 2009 case. Well, I think that that's, you know, the government has. And then they say, well, then, therefore, it's obviously factual. Well, let me take that point first, because I think it's a very important, it's very important to understand the break-taking character of the government's submission here. The government's view is that factual means what the district court found, and that that's sufficient to make it both factual and uncontroversial under Zotero. That is absolutely false, and it also would mean that every time the government wins a civil case. Not just factual, but factual findings that your clients did not challenge. Well, let me deal with the second part of that statement first. We actually dispute that. But let me deal with the bankruptcy of the theory first, which is to say, you know, courts of appeals, in fact, affirm and district courts find all sorts of disputable propositions. The applicable standard under Anderson v. City of Bessemer is that you are required to affirm any reasonable view of the evidence, even if there are multiple views of the evidence that the fact finder did not adopt. It is inherent in the standard that anything that is even affirmed in an appeal is not necessarily factual and uncontroversial in the relevant sense. And I think the best measure of that is that since 2006, and it's now nine years, every state and federal court that has been presented with these findings, including on the question of manipulation and has been asked to give collateral estoppel effect to it, has declined expressly on the theory that other courts have come to different conclusions and that it would be unfair to the defendants to preclude them from having a new trial on the same issue. If federal and state courts in this country are willing to give us a new trial on these things that the government now says are so conclusive that we must broadcast them from the ceiling, from the rooftop, excuse me, it clearly cannot be fairly said that these things are factual and uncontroversial. As to the question as to whether we challenge these things in an appeal or not, I think the government is vastly over- Actually, your argument goes even further than the question of facts. It's also an argument that the disclosures required under this order are misleading. Well, right, and I was going to go to that point next because it does imply, first, to take my last point, that there is no side to the story, whereas we could truthfully say to people, eight courts, state and federal, think that this is not true or that this is not so clear after all. It implies that we're, you know, by not having a time frame at all, that we're still engaged in these very same aspects of wrongdoing, even though, you know, the evidence that gave rise to many of these findings is decades old. What do you think is misleading? The absence of a time frame saying that the district court has found that we deliberately- I mean, what statement do you think is factually wrong? There was no intentionally designed cigarettes with enough nicotine to create and sustain addiction? Well, I think that, you know, we do not think that that's what we do, and other courts- No, no, no. Are you suggesting to us, in light of our law of the case and the proceedings and what's in the record, that that's not correct? Oh, no. Judge Edwards, to be perfectly clear, I accept that the law of the case, for purposes of the judgment in this case, is what you say. I'm not disputing that. Okay, but you're suggesting that that, for example, that statement is incorrect? What I'm saying is that what the court characterized as a manipulation of the nicotine content could be viewed as certain production steps to smooth out, you know, the taste of cigarettes and other things. But the point is not whether it is correct for purposes of the law of the case- No, I'm really confused. You cited this one bullet, and I've been looking at it, and I'm just really not sure what your argument is. Cigarette companies intentionally designed cigarettes with enough nicotine to create and sustain addiction. Is that somehow- it's certainly not confusing to me. Well, our point has been that the implication is that we spike cigarettes with nicotine, which actually is not true. Well, who said that? That isn't what I read in it. I don't think that's naturally inferable, that you spiked nicotine. I think it says what it says. You intentionally designed cigarettes with enough nicotine to create and sustain addiction. Under the court's- Is that wrong? Are you saying that's wrong? We do say that that's wrong, but we recognize it as law of the case. No, wait, wait, wait. Apart from that, I hear you in the law of the case. Are you saying it's right, but it says more than what appears to be there, and that's why you're offended? I think it implies to at least some reader, even if not to you, that we do things that we do not do. And I can see that my time is- Wait, wait, wait. You can keep going, because I have a few more questions. No, I'm done. I was curious about that. So you say the government's wrong that these are not supported by unchallenged findings. Let me just take the one you're talking about right now, okay? You say in your brief, and I'm looking at page 41, you say- This is one of your objections to these bulleted statements. You say, all cigarettes would be addictive. He says, even without any adjustments made by defendants, all cigarettes would be addictive, right? So, finding 1366, district court finding 1366. Defendants have designed their cigarettes to precisely control nicotine level delivery levels and provide doses of nicotine sufficient to create and sustain addiction. Now, I look back, I did not see that defendants have challenged that finding in the 09 proceeding. Judge Teto, I mean, I understand what you're saying. Okay. And I think I will say again that whether the theory is law of the case or estoppel, it cannot be the case that as a matter of federal constitutional law, whatever may have been forfeited, waived, or found in one case necessarily so conclusively binds an actor that the government is entitled to compel its disclosure from the rooftops even though federal courts and state courts elsewhere are prepared to view the question as open and allow a trial on the same matter. Because although I recognize that for certain litigation purposes, law of the case and estoppel and forfeiture and any other theory that is cognate to what the government is saying with these arguments may be a forceful way to preclude you from having another hearing on the question in the same case, it does not follow that as a matter of constitutional law, under Zoderer, the government is thereby entitled to impose that as a statement of faith in media outside of the courtroom or elsewhere. Because at the end of the day, what the Supreme Court said in Zoderer is that the reason Zoderer allowed this sort of disclosure about a defendant's intrinsic qualities of their products is that the interest that the defendant has in not giving the disclosure about the product that he's marketing is minimal and that the interest of the consumer, by contrast, is very high. But as you also said in American Meat Institute, it is an application of the Central Hudson Standard to a very narrow area. And the government cannot simply say that by winning a single litigation in one courtroom, although the defendant may be bound by the normal legal consequences of that, that it is always an add-on that the government gets to compel the defendant whom he has beaten by a preponderance of the evidence and obtained a judgment under the clear error rule, which allows for multiple reasonable views of the evidence, that the defendant is thereby compelled to accept this as incontestable truth, which is what this Court said in Arca-Reynolds was needed for the type of warning at issue here. Mr. Escrotta, I'm really perplexed on the law. I think I hear what you're saying, but it's perplexing to me in light of how we do business. It may be that there are other district courts and courts of appeals who have their own separate litigations and are determining what to do or not to do and whether to give any respect to our judgments, but I don't know what that has to do with anything. That doesn't affect us. If we have law of the case, we're bound by it. This is at a remedial stage, and it would be a nightmare to think that the federal courts, having gone through a litigation now at a remedial stage, had to stop to see whether other courts were taking a different approach, and if so, had to go back and relitigate everything we'd already done over all these years. That's the thrust of your theory, which makes no sense to me. No, the point that I'm making is that— In other words, let me be very stark and say I really don't much care what these other courts are doing because this is our case, and we owe them no deference, and I'm talking about a legal proposition. I don't mean to sound arrogant, or we know it all, but we have business to do, and so I really don't care that there are other courts that are proceeding on a different course, and if we end up with split opinions, maybe the Supreme Court will see that it's worthwhile they're considering it, but we have business to do, and we can't go back and relitigate in light of matters that are going on in other courts. I am actually saying something entirely different, in other words, which is that whatever the findings are here, the legal standard for imposing compelled disclosure under Charter requires a level of certainty that is not ordinarily met. You're switching to the constitutional issue. Yes, and I think I have been on this for a little bit. That one line in Zadwer, purely factual and uncontroversial, which described the disclosure in that case, Justice White, it's pretty precise, never mentioned that statement again, and you think that's a legal standard? Well, judging from this Court's own bank opinion in American Institute, the Sixth Circuit, as you're probably well aware, does not fully agree with that in the discount tobacco case, but I think for purposes of where we are today, we have to accept, because we are in this circuit, that the legal standard is purely factual and uncontroversial, and because we are in this circuit, we have to take the arguer Reynolds' opinion from the proposition that certain things that might be described as factual, actually you said that in the conflict mineral case as well, do not necessarily entail within the compelled disclosure of the facts, because the freedom of speech includes the right not to avow facts that one disagrees with, even if they're incontestable. What do you think uncontroversial means? And let me give you some background. When the in-bank case was pending for the disclosure of country of origin, there was a proceeding going on challenging that disclosure as a violation of American treaty obligations, and the World Trade Organization has decided that the United States, by requiring those disclosures upheld as uncontroversial, violated U.S. treaty obligations. So I don't know what uncontroversial means. I'm with Judge Kavanaugh on that. Well, I think that it means at least that some things may be factual in certain senses, but that they are fairly debatable or likely to engage the emotions of other speakers to such an extent that it is not appropriate for the government to compel it under this very narrow safe harbor. It may be appropriate for the government then to compel them under central Hudson on a more harder choice. If there's a split of authority regarding a particular, take a scientific fact, and the disclosure that's required is for all internal combustion engines, use of this product contributes to global warming. Is that controversial or uncontroversial? I think that it's controversial in the same sense as certain disclosures say, for example, about getting an abortion. There was a second circuit case on the subject of getting an abortion, and I think one could say that many of the disclosures about ultrasounds and whatnot are factual in some sense and maybe not scientifically debatable, but still remains the question whether there is an appropriate role for the government to compel citizens to avow things that excite emotion and that give rise to controversy. Is the statement in corrective statement E, there is no safe level of exposure to secondhand smoke? No. You know, if I walk through a crowd and somebody's smoking a cigarette, I'm in danger. Is that controversial? Well, I think that that's, I mean, we think that the entire subject is controversial, and if we were sort of trying to do what the government accuses us of doing, which is to prolong this, we would have challenged a lot more of this, because on the broader theory, a lot of these things, even if backed by the just before judgment, are not factual and controversial in the sense that you and I have been discussing. But in fact, we did not challenge some of the secondhand tobacco just because we wanted to target our challenges on the most object-general aspects of the preambles and on those parts of B and D, or the manipulation and the addiction, that I think unduly and unconstitutionally center on our conduct. When what was contemplated and argued by the mandate and by the very narrow focus of the recall law in the circuit was disclosures about the intrinsic qualities of our products. And again, just so that I'm not misunderstood as to where we are, if you fail to meet Zotter, which is a very narrow safe harbor for the government to compel speech when there is really no controversy about whether this should be disclosed, you might still, as in some of these orders that you see, Daniel chapter 1 and whatnot, where you have a remedial statute with broader aims, you might be able to compel it sometimes under central Hudson. We don't think that that's open based on the mandate of this court in 2009, because the mandate was limited specifically to Zotter. But we also have an argument that the confessional aspects of these things failed central Hudson, because they're broader than necessary and certainly not tailored enough to achieve the only. Mr. Estrada, let me just pursue the question Judge Randolph asked you a few minutes ago about what uncontroversial means. AMI, which is an on-bank opinion, defines it, at least in that case, and I'm curious why it isn't applicable to this case. It says they weren't controversial in that case because AMI doesn't disagree with the facts to be disclosed. They don't disagree with the fact to be disclosed, quote. So there is no claim that they are controversial in that sense. That's from AMI. I may be misremembering, Your Honor, and maybe for interrupting, but I think that what the court said is there is no claim that they are controversial, at least in that sense. But maybe I'm misremembering. Yeah, well, right. And so here you have a situation where if the government is correct that these three, and I'm only talking about the three bulleted statements, not the preemptives. Okay? Government's position is that those rest on unchallenged factual findings. So if they're not controversial in that sense, in what sense are they controversial? Well, I think, you know, the government, just to take, you know, the broader assertion that we did not challenge all these things, and I know that they would like to point this out. Well, I just asked you about one of them. No, no, no. I could go through all four of them if you want. But I think it is important to point out that the opinion of the court, you know, reflects that we did challenge all of these things and that you upheld it under the clear error standard. So the notion that we did not challenge them when you found them not clearly erroneous upon our challenge is not really a very viable premise when it is apparent from the face of the 2009 opinion that we did challenge these things that the court considered. Okay. But going forward to the merits of your question, it seems to me that it has two answers. You know, the first one is that we are once again debating the proposition of whether a procedural forfeiture, if that's what you think happened in 2009, is sufficient to compel speech in all other fora. And I do not agree with that for the reasons that I previously stated. Okay. But the second aspect of it, if I may, Judge Taylor, is that I think what the en banc court was saying was it is not controversial, at least in that sense. It was not reporting to give a guideline for what is always controversial. And it does seem to me that we — That's true. I agree with that reading. You're right about that. And I think that we can continue to then say that when these same things are presented — In what sense is it? Well — That was my question. I will go back — Because I agree with your reading of AMI. I will go back to the point that I made earlier, which is to say when the same finding, including, you know, the manipulation finding that you have been highlighted, has been presented to the courts, like the Fuchs courts, which we cite in our case. We're going over the same ground. I just want to ask you an extremely technical question that we might actually get some agreement on. One of your objections is to statement C, low tar and filtered cigarette smokers inhale essentially the same amount, right? Yes. Okay. And one of your objections to that is that — one of your objections to that is that it suggests that — you suggest that it says that regular cigarettes are not filtered, right? And that filtered cigarettes are no safer than non-filtered, right? That's your objection to that. But isn't that — do you think that's a typo? Do you think it should say — that it should say low tar and light cigarette smokers? Because that's what this — that's what the preamble's about, and that's what the previous bullet's about. And if it said that, setting aside your other objections to this, that is, your First Amendment objections, that would make that accurate. I agree that if you took out the filtered one and put in that, that would take care of that objection. Okay, fine. And yes — I'm not — I understand all your other objections to it, but that would solve that problem. I mean, you know, just to make sure I have it on the record, it is unlawful for us to use law and light and all of these things. And so now we're in a very odd world in which, by order of the federal court, we are, you know, required to engage in speech that otherwise would be unlawful for us to engage in under the FDA. And, you know, we live in a world in which these things are no longer sold or marketed as light, natural, et cetera, because federal law makes that unlawful. And there are no tar content warnings on the box anymore. But yet there is, under the guise of RICO, mind you, which is intended solely to affect our ability to make false statements about these things in the future, we're being told that we have to embrace this and — So what's your response to what the interveners say? They say that the defendants switch from light and low tar to gold and other colors, telling them they can find their light by color. And then they have this very specific allegation about Marlboro, which put a note on the last pack of its cigarettes saying, your Marlboro light package is changing, but your cigarette stays the same. Well, I think that — And they cite — they actually — this is in the record. Oh, no, they said it below. Yeah. And I don't think that it got anywhere there either. They also said it, I think, to the FDA, which actually looked into this, and nothing came to that. And the reason that nothing has come to it is because all that my client did, and Philip Morris is my client, was to tell consumers that if they buy these things for their taste and, you know, gold's taste different from regular Marlboros, their brand will be called gold. There was no representation that there was going to be any health benefit. It was done only for a transitional period of, I think, three months, and it hasn't been done since. And so in a world in which all we did was to make sure that brands that are different, in fact, would be viewed as different by the consumer, I don't think that that is a basis for the implication of fraud that they're trying to say. But in any event, we go back to the mandate of the court, which rests on the proposition that the sole theory on which these disclosures are authorized is the proposition that by making us say them, we will be kept from saying the opposite in the future. And in a world in which saying the opposite in the future or saying anything on the subject in the future is lawful under federal law, it seems to me that that's a little bit, I don't know how to characterize it, maybe unnecessary. But you've been very generous with your time. Okay, we're way over. Thank you, Your Honor. Okay, yeah. May it please the Court. Melissa Patterson for the United States. I think it's helpful to start out by reviewing where we are in this litigation. The defendants have been found liable for committing a scheme to defraud the American public, a very particular type of scheme that involved subverting truthful information that was out there in the marketplace. I'm talking about the, well, go ahead. That they're likely to do it again. And third, that the district court was tasked with crafting a remedial order, crafting corrective statements, that prevented and restrained these particular defendants from committing their particular type of fraud again. When we talk about the preambles, the district court explained what it was trying to do there. It was trying to prevent these defendants from, again, sowing doubt, from suggesting later. But it said it was doing that by ensuring that consumers were not confused. That's what it said. Your Honor, it also said, I'm trying to prevent defendants from arguing in future that there's not really a consensus about these bullet points. Now, wait, you just switched. I thought you were talking about the preambles. Yes, Your Honor. Let's divide our discussion into two parts. Let's start with the preambles, okay? Okay. I understand your argument. I'm not saying I agree with it, but I understand your argument about the three bulleted points, that they reveal the hidden truth about the products. But, I mean, they explain exactly what defendants did, that they manipulated their product. But the preambles don't do that. They focus on the deception of the public, right? And that's different than focusing on the product. So, Your Honor, I think it's, in addition to dividing between preambles and bullets, I think it's helpful to divide between RICO and the First Amendment discussion. No, no, no. Let's stick with the preamble and RICO. The preamble and RICO. Just a minute, okay? Yes. Because, you know, Mike, I'm asking you this question because as I read our earlier decisions, the 09 decision, the disgorgement decision, and the decision on the cross-opinion, that all three of these opinions limit a RICO violation to preventing and restraining. And they very clearly say that discouraging is not part of it. That that isn't part of the remedy. It can't be. And I don't, I don't, I'd like you to explain to me how, the only thing I could find in the district court decision was that it prevents and restrains by avoiding or preventing consumer misconception. I understand that argument, and that argument was made by the dissent in the disgorgement decision, but it was the dissent. Your Honor, I don't think that's the only reason the district court gave. And I would point to pages JA211 through 213, where it reviewed the defendant's objections to the preambles. And the district court said, I need to let people know that they were misled because I don't want defendants to, in future, argue that there's not really a consensus about these bullet points. So let's just take a step back and review the type of fraud perpetrated here for so long. It's not as if some of the information in some of these bullet points had never been heard by the public before. The Surgeon General, public health groups were trying to get truthful information out there, and defendants perpetrated what they called their open question strategy. They would take truthful information, like that that's in the bullet points, and subvert it, make people think, it's not really final yet, you need further research. They created faux independence scientific research to create what they called marketable science to put out there in the blue with the truthful bullet points that the government and other people were trying to convey to the public. So the district court here, we think, did not abuse its discretion, and recall, if we're talking about RICO, this is an abuse of discretion standard, and thinking, I just can't put these naked bullet points out there. I need to provide what she called... Why do you say, I'm asking whether or not there's a violation of this court's, why is this abuse of discretion? We're not looking at this remedy for the first time. We're trying to understand whether these preambles are consistent with what this court has said in this case about the scope of a RICO remedy. I don't think that's abuse of discretion standard. Isn't that just a straight legal question? We're now deciding whether this remedy is consistent with our mandate. I think compliance with the mandate is a straight legal question. I don't think this court said one way or another. I certainly don't think this court suggested that any conduct-based statements were off the table. As you discussed with defendants' counsel, there was an entire statement devoted to conduct. I'm not saying that it... No, you're now slipping back to the three bulleted statements. I'm only talking at this part of our discussion about the preamble. Right, and to the extent that... And the preambles were not before this court. They were not, that is true. And, in fact, and I'll just ask you about their argument about our rejection in the 09 decision of the program to reduce the number of smokers. And we rejected that under RICO. We said we reject general deterrence remedies. And then we relied on this Second Circuit decision, which says that prevent and restrain does not mean prevent, restrain, and discourage. I mean, in other words, that, the rejection, explain to me why our rejection of that remedy. That is that if you reduce the number of smokers, it will reduce the incentive of the defendants to violate RICO. How is that any different than the district court's rationale for the preamble? Because she wasn't simply trying to generally deter. She was trying to follow this court's mandate at 1140, page 1140 of its opinion, that said, if at the same time you communicate opposite truthful messages about these matters. These matters were defendants, I'm looking up earlier in that sentences, false and misleading assurances about, for instance, smoking related diseases and addictiveness. And, of course, all five of the particular statements were before the district court then. I think it was open as an exercise of her discretion to think about what context do I need to give consumers in conveying these truthful product-based messages in order to prevent and restrain these defendants from again perpetrating their- 2-1-1 to 2-1-3? Yes, your honor. I believe that's- That doesn't deal with the preamble. It deals with secondhand smoke in one of the bullets. So, where is it? Let me find it. So, I'm looking at 2-1-2. That's secondhand smoke. The district court says, the corrective statement submitted by defendants, i.e. without the preambles, would be less effective at preventing and restraining. It goes on to say later in the next paragraph, by ensuring consumers- No, no, no. Finish the sentence. It is talking about secondhand smoke, but I think that rationale- It's not talking about the preambles. It's talking about secondhand smoke. Your honor, I think the analysis carries over by ensuring consumers know that defendants have misled the public in the past on the issue of secondhand smoke. But I think this rationale carries over to every statement, because again, every statement has the same preamble. In addition to putting forth the fact that a scientific consensus on this subject exists, defendants will be less likely to attempt to argue in the future that such a consensus does not exist. And I think that rationale is the same thread runs through all of the preambles. They're all the same preamble. The district court's trying to prevent and restrain this very type of fraud that created an open question. And the district court, I believe earlier, at 2-0-4, 2-0-5, said, I need to look at the entirety- I'm not sure I get it. In other words, the district court says, unless- If the defendants simply say, there's no safe level of secondhand smoke, exposure to secondhand smoke, which I think is a very doubtful proposition. It doesn't sound very scientific. But if that's all they said, then people wouldn't believe it. You have to say, we've deceived you in the past, now we say secondhand smoke, no exposure is safe? Yes, sir. I'd like to note, that statement is actually unchallenged by defendants. I understand that. At page 2-0-5, JA 2-0-5, the district court explained, I have to look to the entirety of defendants' deceptive scheme. And it contrasted to cases like Warner-Lambert, where there had been a specific, single misrepresentation over a number of years. The district court said, if I were dealing with a specific, single misrepresentation, yeah. Maybe the simpler sort of disclosure, maybe just the bullet point information would be enough. But here, I'm looking at the entirety of this record. I'm looking at the type of fraud these defendants perpetrated. And we need to do more. People need to understand, it is important and necessary context, she said, to understand the truth of those bullet points, that they are not an open question. They are not an area in which further research is needed. Because that was the way that this fraud worked before. Defendants, if we're turning to the First Amendment analysis. I've got one more question. Did you have another question? They described something where no further research is needed. Did you say that? You don't mean that, do you? I'm suggesting that the prior fraud suggested that, hey, one scientist says this, maybe other scientists say this. And some of those scientists were faux independent science. Who really knows the answer? This is an open question as a health reassurance tactic to persuade to falsely deceive smokers and potential smokers. What the district court said is, I don't want the truth of these bullet points being seen as or being vulnerable to that type of undermining in the future. So my question to you so far has been about, just as it were to Mr. Estrada, about the extent to which our three earlier decisions on this subject bind or control the way we think about this issue. Right? That's my question. I haven't asked you yet about the disgorgement opinion. And I'd like you to explain to me again how the preambles, and I'm only focusing on the preambles here, are consistent with that. In that case, there was actual expert testimony, which there isn't here. Actual expert testimony that the disgorgement would create an economic incentive that would prevent future recovery. And the court over dissent, which relied on that, it acknowledged the expert testimony. It even acknowledged that disgorgement could lead, here's its language, disgorgement may act to prevent and restrain future violations by general deterrence. But it went ahead and very specifically rejected that rationale. I think my answer is the same as before, is that this isn't a general deterrence rationale. This court instructed, I'm looking at 1140. Well, that's what the dissent argued in the disgorgement case, too. Well, Your Honor, the district court, again, the district court's trying to follow the mandate. It says they need to communicate opposite truthful messages about these matters to consumers. How can the district court ensure. What's the next sentence? And it says opposite truth, reveal the previously hidden truth about their products will prevent and restrain. And I think what the district court was doing is trying to make sure that those bullet points are understood correctly as the real truth, not simply as bullet points that are sort of out there in the competing marketplace of bullet points as they were before. The district court needed to prevent and restrain this particular type of fraud by these particular type of defendants. And that, I think, if we're talking about how necessary this is to prevent and restrain under RICO, is reviewed for an abuse of discretion. And I think the court was within her discretion to conclude, I just can't throw these bullet points out there. Some of this information has been out there before. I need to give consumers important and necessary context about how to understand the truthful information about defendants' products. Do you want to go on and say something about the First Amendment? I know I kept interrupting your efforts to get there. I do. I think there's this idea through defendants' briefing that simply requiring someone who's been adjudicated to do something wrong to disclose that fact is somehow just off the table for First Amendment purposes. That this is so inflammatory and self-vilifying that it just cannot be in our system. And I think that things like FTC orders, things like NLRB postings, show that this is hardly unprecedented. In a variety of contexts, we ask courts and agencies, make people who have been fully adjudicated to have done something wrong, to disclose that fact, as long as it's consistent with whatever the government purpose here is. As we've been discussing, this was consistent with a purpose of preventing and restraining. So defendants characterized the language in these statements a number of ways. We have to say we're reprehensible and untrustworthy wrongdoers. This is the Scarlet Letter. I refer the court to the actual statements here, which in context read like litigation notices. It's an accurate reporting of what happened in this litigation. A federal court has ruled that the defendant tobacco companies deliberately deceive the American public about the health effects of smoking and has ordered those companies to make this statement. Here is the truth, followed by bullet points. District Court was not trying to shame, humiliate, punish any of those things. The District Court was trying to prevent and restrain this type of fraud from happening again. I do see that I'm into interveners' time. I don't want to deny them their time. Did you have any other questions? No. Okay, I have just two of my typo questions for you. Okay. One is do you agree that filtered should mean light? I don't, Your Honor. You don't? If you look at the beginning of that statement, regular cigarettes is juxtaposed with light and low tar, so you kind of have two categories, light and low tar, and then you have regular cigarettes. Look at the preamble. By falsely selling and advertising low tar and light cigarettes. That's what the preamble says. It does, yes. And the bullet right before this one says, the previous bullet says the same thing. Many smokers switch to low tar and light cigarettes. I'm loathe to attribute this to a simple typo, Your Honor. There were a number of factual findings that filters played a role in the health reassurance strategies that defendants falsely pursued. I don't think it's saying anything about unfiltered cigarettes. Okay, but if it's not a typo, aren't the defendants right that this falsely says that regular cigarettes are not filtered and that filtered cigarettes are no safer than unfiltered? No, Your Honor. Is it inaccurate? No. When it says regular cigarettes, it's clear from the preamble that regular is juxtaposed with light and low tar. So it's saying low tar and filtered cigarettes, smokers inhale essentially the same amount of tar and nicotine as they would from cigarettes that are not light and low tar. I think that's a fair reading of the statement here. Okay. My other typo question. Statement D, rate controlling the impact and ammonia. Everything else in this as in all the other bulleted statements about their conduct are in the past tense. This one's not. Shouldn't that be in the past tense also? Your Honor, I don't think there's any suggestion that somehow defendants have reverted to a cruder form of cigarette that don't do all of these things. The others are in the past tense. Shouldn't this one be in the past tense? Is there some significance to it being in the present tense? I think the present tense formulation may have been deliberate. The district court didn't opine on this particular point because the cigarettes in which they control the impact and delivery of nicotine, those are the same cigarettes that are on the market. Cigarette companies are still pushing the same product that have the same control features in them. Okay. Is there any evidence that electronic cigarettes cause cancer? I'm unaware of that. I think that's beyond the scope of this case. I just don't know, Your Honor. This doesn't cover electronic cigarettes, does it? It doesn't say that. I don't believe it does, Your Honor. It doesn't say anything about electronic cigarettes. Okay. Can I turn it over to interveners now? Yes. We'll hear from the amicus. Thank you, Your Honor. Howard Crystal for the public health interveners. The corrective statements must be considered in light of the district court's findings of massive fraud, which demonstrate that public health messages alone are not sufficient to restrain further fraud. Long after public health messages appeared on every cigarette pack and in many other places, the district court heard testimony from the defendant's highest executives, and she summarized many of her findings. This is on page 910 of her opinion. Quote, as defendant's senior executives took the witness stand at trial, one after another, it became exceedingly clear that these defendants have not, as they claim, ceased their wrongdoing, or as they argue throughout the trial, undertaken fundamental or permanent institutional change. The question is, what language in corrective statements are appropriate under the various standards to restrain future fraud? What's the time frame of that? Well, Your Honor, the district court's judgment was in 2006. I know. She's talking about past events. Yeah, that's correct, Your Honor. When did they occur? Well, over many years. It was a 50-year fraud, Your Honor, that the district court, and this is critical, and that this court also affirmed, is likely to continue. There's no suggestion that this fraud is not continuing. Judge Tatel gave one example. Do you agree with the statement on page 40 of the appellant's brief that for more than a decade, Philip Morris has agreed that smoking causes damage to health and is addictive? Your Honor, there are certain findings in the opinion about Philip Morris changing its position to some degree. The district court, however, did find that Philip Morris and all of the defendants continue their fraud, are likely to continue their fraud, and that's the premise for all of the remedies. All of the remedies are premised on the finding that fraud is likely to continue, which this court affirmed not only in the original appeal but in the subsequent appeal when the defendants argued that the Tobacco Control Act somehow obviated future fraud. And not only with regard to other remedies, this court specifically addressed the Lotar fraud, even though descriptors had been banned, and found in that appeal that remedies related to Lotar were also likely to continue. Because on that score, it's important to recognize that the Lotar fraud is not limited to the descriptors themselves. The court found that the fraud went far beyond that, and the product itself is still sold. Lights and Lotar cigarettes are still sold under other names, and therefore the remedy is entirely appropriate. And with regard to Judge Tatel's specific question on the word filter, I just want to point out that there are findings, findings 1581 to 1584, which talk about filtered cigarettes, the filtering of cigarettes being a particularly important part of the Lotar fraud. So in our view, reading that part of the bullet about Lotar, or light I believe it is, and filtered cigarettes. What were the numbers of those? 1581 to 1584 talk about filter design. Your Honor, with regard to the preambles, which has been a focus here this morning, I think it's important in addition to the previously hidden truth language, which Judge Tatel pointed out, which we think is relevant, the court also used the words that the statements may address defendant's false assertions. And again, we would submit that that's exactly what these statements do in the preambles. They address the false assertions, and they're specifically designed to make sure that not just the public gets public health information, that was not enough, but that the public knows that these defendants deceived them, which will attract notice. In the Warner case, the court rejected that contrary to prior advertising preamble, specifically because it said it wasn't necessary to attract notice. But given the public health information that's out there, it's absolutely, in our view, uncontrovertible that that preamble is necessary in order to sufficiently attract attention and in order to sufficiently detract from further fraud. Also, with regard to, there was some discussion at AMI. I think this is very important because the defendants seek to draw this firm distinction between conduct and the properties of cigarettes. And we don't think that distinction is borne out by the precedents. The conduct that's being talked about is conduct inextricably intertwined with the product. The court said on page 1143 of the affirmance opinion that the statements may be related to the efficacy, safety, and quality of the product. And AMI itself, it's not, I don't think it's a fair characterization to say that saying that the animals were slaughtered in Canada is just about the product. That says something about what happened to the product. And saying that cigarettes were manipulated is similarly a statement about the product that is entirely appropriate in light of the court's findings. Thank you. Thank you. Let's see. Mr. Estrada, you were out of time, but you can take two minutes if you like. Thank you. Just let me make a few points. I mean, I do think that what the district court should have done with respect to uncontestable facts should have been to attribute them to health authorities, where that's possible if they're indeed uncontestable. With respect to the bullets that are proper as on the subject of manipulation, since we don't agree with them, I think the only appropriate thing would be to say that a federal district court has ordered us to say these things. And unlike Mr. Crystal, I do not believe that that necessarily implies a statement about the conduct of the defendants. I will point out that in the American meat case, this court actually passed on saying butcher or slaughtered, since the regulation did allow for the alternative use of the word harvested. And I think it's a fair inference from the Embanco opinion that you can compel me to say that I harvested the meat in my ranch in Romania, but you cannot constitutionally compel me to say that I am a butcher from Transylvania. On the point on whether we're likely to continue to engage in these things in the future, I think it is fair to say that the court concluded that court supervision was needed. I don't believe that is equivalent from the implication of any of these statements in the absence of a time frame that we are currently engaging in these things where the evidence actually showed that they occurred decades ago. Thank you so much. Thank you. Okay. Case is submitted and we'll take a brief recess.
judges: Tatel, Edwards, Randolph